# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Elias Vasquez,<br><br>Defendant. | No. CR-18-0027-T UC-JGZ (LCK)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court are Defendant's Motion to Suppress Statements (Doc. 40) and Motion to Suppress Identification (Doc. 39). The government filed responses to both motions. (Docs. 50, 51.) This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 57.6. Evidence and argument were heard on March 16 and April 13, 2018.[1] (Doc. 44.) This matter was submitted following oral argument held on April 20, 2018. (Doc. 88.)

Defendant contends that his *Miranda* waiver was not knowing, intelligent and voluntary and his statement was not voluntary. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motion to suppress his statements. Defendant also argues the Court should suppress Agent Pintado's identification of Defendant. Having now considered the matter,

---

[1] "RT1" refers to the Reporter's Transcript of the March 16, 2018 evidentiary hearing. (Doc. 72.) "RT2" refers to the Reporter's Transcript of the April 13, 2018 evidentiary hearing. (Doc. 87.)

the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motion to suppress identification.

## I. FACTUAL BACKGROUND

Defendant Elias Vasquez is charged with conspiracy to transport illegal aliens, transporting illegal aliens, and fleeing from an immigration checkpoint. (Doc. 21.)

On the night of December 4, 2017, Border Patrol Agent Cynthia Pintado was working at the I-19 border patrol checkpoint. (RT1 at 8, 18.) During her shift, at 9:35 p.m., a blue semi-truck without a trailer pulled up to the primary inspection lane where she was working. (*Id.* at 8-9, 18; RT2 at 62; Exs. 3, 8.) Agent Pintado climbed up on the side step of the truck to talk to the driver. (RT1 at 10.) She asked the male driver if he was alone and he said, "yes," and pulled back the curtain. (*Id.* at 10, 23.) When she asked if they could search the cabin of the truck, the driver became angry and opened the truck door, which knocked her off the step. (*Id.* at 11.) Agent Pintado again asked the driver if he would allow them to search the cabin, and he said, "come in and search it." (*Id.*) Agent Pintado told the driver he would need to go to the secondary area for the search. (*Id.*) The driver accelerated and drove away from the checkpoint. (*Id.*)

The truck was in Agent Pintado's inspection zone for 29 seconds; she estimated being on the truck's side-step for 20 seconds. (RT1 at 12; RT2 at 36; Ex. 7.) In the five minutes prior to the blue semi-truck approaching her lane, 11 semi-trucks (all with trailers) and one car passed through her inspection area; she spoke to five of the semi drivers, two of them step-side. (RT2 at 34-35; Ex. 8.) Agent Pintado had a well-lit clear view of the driver and described him as of Hispanic descent, bald (no hat), medium build, and 30 to 40 years old. (RT1 at 12-13, 22, 23, 28, 29.) Agent Pintado stated that she was confident in her memory of the driver because she had been just two feet from him and she'll never forget getting pushed off the step. (*Id.* at 30.)

On December 4, 2017, Task Force Officer Jorge Rodriguez received a phone call from the I-19 checkpoint that a truck had fled from that location. (RT1 at 56.) TFO Rodriguez responded to I-19 and, when the truck passed his location, he joined the other units pursuing the truck. (*Id.* at 56-57.) The truck reached speeds of 90 miles-per-hour

and agents lost sight of the truck for a period of time, but it was later located at the Triple T truck stop in Tucson at 10:18 p.m. (*Id.* at 57; RT2 at 66.) There was no driver with the vehicle but five individuals, illegally in the country, were found inside. (RT1 at 58.)

At 3:53 a.m. on December 5, TFO Rodriguez spoke to material witness Martinez-Lopez, one of the truck passengers. (RT2 at 39, 42.) Martinez-Lopez said he could not describe the driver of the truck, that he did not get a good look at him. (*Id.* at 39-40.) TFO Rodriguez spoke to a second passenger, material witness Zaragoza-Guzman, at 4:12 a.m. (*Id.* at 41.) He described the driver as male, skinny, and wearing a hat. (*Id.*)

The following day, at 2:08 p.m. on December 5, TFO Rodriguez received an email that agents had found a debit card in the blue semi-truck, with the name Elias Vasquez on it. (RT1 at 59, 75; RT2 at 68.) He also received a driver's license photo for Vasquez and prior checkpoint photos of the semi-truck. (RT1 at 59-60, 76, 86.) The checkpoint photos were taken November 1, 16, 20, and December 4. (RT2 at 58-61; Exs. 6, 7.) TFO Rodriguez reviewed the December 4 photos on the computer system. (RT2 at 69-70.) He concluded the driver's license photo was of the same person as the checkpoint photos. (RT1 at 60, 86-87.)

TFO Rodriguez telephoned Agent Pintado on December 5, and told her he was going to send her a picture of someone that possibly was driving the blue semi-truck she had encountered the previous night. (RT1 at 13, 15, 61.) Agent Pintado testified that TFO Rodriguez informed her that he had a driver's license photograph of a person whose debit card was found in the blue truck. (*Id.* at 13.) Agent Rodriguez sent her the driver's license photograph (not a photo lineup) by text message at 2:52 p.m. (*Id.* at 13, 25, 88; Ex. 4.) Agent Pintado was absolutely sure when she saw the photograph that it was the driver of the blue semi-truck from the night before. (RT1 at 14.) She responded right back to TFO Rodriguez that the photograph was of the driver. (*Id.* at 27, 87.) At the time TFO Rodriguez contacted Agent Pintado, he was concerned about rapidly identifying the driver because the possible material witnesses to the driver's crime could be transferred out of the area if a complaint was not filed against the suspect. (*Id.* at 62-63, 72; RT2 at 72-74.)

TFO Rodriguez did a second interview with the material witnesses on the evening of December 5, during which he used a 5-photo lineup. (RT1 at 88; RT2 at 42, 44.) At 7:40 p.m., Zaragoza-Guzman stated that he did not get a good look at the driver because the driver had been facing forward, but he estimated him to be 45 years old. (RT2 at 43.) Zaragoza-Guzman did not select a photograph of the driver from the lineup. (*Id.* at 44, 45.) At 7:56 p.m. on December 5, Martinez-Lopez stated that he only saw the side of the driver's face and he thought he had facial hair; he believed the photograph of Defendant Vasquez looked like the driver but he couldn't be sure. (*Id.* at 40, 44-45.)

On December 7, 2017, Defendant was arrested at the DeConcini port of entry and transported to the HSI substation in Tucson. (RT1 at 33, 65.) During transport, Defendant asked why he was being detained. (*Id.* at 65.) The agents told him there was an arrest warrant for him based on alien smuggling, and Defendant responded, "What do you mean, like UFOs?" (*Id.* at 65-66.) TFO Rodriguez interpreted it as a denial of the events but did not ask Defendant about that statement. (*Id.* at 66, 97-98.)

HSI Special Agent Jose Mendoza met Defendant at the substation for processing. (*Id.* at 33.) SA Mendoza removed Defendant's handcuffs but kept ankle shackles on him. (*Id.* at 34.) The agent testified that Defendant was very upset when he arrived, he was cussing and clenching his fists, and stated that he was going to file a lawsuit for wrongful arrest because they had gotten the wrong guy. (*Id.* at 35, 39-40.) The agent spoke to Defendant in both English and Spanish and found that Spanish was somewhat calming for Defendant. (*Id.* at 35.) SA Mendoza read Defendant his rights in English from the I-214 form; Defendant did not ask any questions. (*Id.* at 35-36.) Defendant responded appropriately to SA Mendoza's biographical questions and gave no indication that he did not understand anything. (*Id.* at 34-35, 36.)

After he completed processing, SA Mendoza walked Defendant to an interview room. (*Id.* at 36.) The room was 6 feet by 8 feet, with a table in the middle, three chairs, and an unlocked door. (*Id.* at 66.) Both SA Mendoza and TFO Rodriguez were in plain clothes and neither had a weapon on him. (*Id.* at 34, 67.) Defendant said he did not have a preference for Spanish or English, and he used both during the interview. (*Id.* at 94; RT2

at 63.) TFO Rodriguez did not ask Defendant if he could read or his education level. (RT1 at 94, 95.) Prior to questioning, TFO Rodriguez read Defendant his *Miranda* rights in English. (RT1 at 68; RT2 at 63.) Defendant noted that his rights had already been read to him (by SA Mendoza). (RT1 at 44; Ex. 1 at 181.) The agent testified that Defendant indicated he understood his rights and he signed a form waiving his rights and agreeing to answer questions. (RT1 at 68; Ex. 5.) TFO Rodriguez testified that Defendant never indicated that he didn't understand him, didn't know the agent's role in the process, or didn't know where he was. (RT1 at 69-70.) Neither SA Mendoza nor TFO Rodriguez perceived that Defendant had any intellectual disabilities although neither of them have experience with persons with intellectual disabilities. (*Id.* at 36, 41, 70, 96-97.)

Defendant was examined by psychologist Sergio Martinez, Ph.D. in 2011 and again in March 2018. (Exs. 27, 28.) Defendant's full scale IQ in 2011 was 68, and in 2018 it was 66, both of which fall in the extremely low category (second percentile). (Ex. 27 at 4; Ex. 28 at 2.) Defendant's verbal comprehension score was borderline (2011) and extremely low (2018), and working memory was extremely low (2011 and 2018).

## II. DISCUSSION

### A. Motion to Suppress Statements

### *Miranda* – Knowing and Intelligent

Defendant Vasquez argues that his *Miranda* waiver was not valid because he did not have the mental capacity to understand his rights and to voluntarily waive them. For incriminating statements obtained during a custodial interrogation to be admissible, any waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). There is a presumption against waiver, and the Government bears the burden of proving a valid waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). The Court must evaluate the *Miranda* warnings in totality when determining if they were sufficient. *See United States v. Miguel*, 952 F.2d 285, 288 (9th Cir. 1991).

Defendant argues that his waiver was not knowing and intelligent because he is not mentally capable of understanding the consequences. A waiver is knowing and intelligent if, under the totality of the circumstances, it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (citations and quotations omitted). Defendant expressed confusion about what event had led to his arrest but did not ask any questions about his rights. (Ex. 1 at 182-85.) Before Defendant waved his rights, agents read them to him twice and TFO Ortiz restated the charges against Defendant. (RT1 at 35-36; Ex. 1 at 181-82, 185.) Defendant stated that an agent had already read him his rights and he understood his rights. (RT1 at 44; Ex. 1 at 182.) TFO Ortiz then read the waiver form to Defendant, which included a statement that Defendant fully understood his rights, and Defendant signed it (Ex. 1 at 186; Ex. 5). *See United States v. Bernard S.*, 795 F.2d 749, 753 n.4 (9th Cir. 1986) ("a written waiver of one's *Miranda* rights is 'strong' evidence that the waiver is valid.") (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

Dr. Martinez testified generally about Defendant's intellectual abilities but offered no opinion on Defendant's ability to understand his legal rights and the consequences of waiving them. Thus, there is no evidence before the Court that Defendant could not enter a knowing and intelligent waiver. In a prior criminal case, Defendant invoked his right to silence, choosing not to waive, which indicates knowledge of the consequences of waiving. The record reflects that Defendant was apprised correctly of his rights and the consequences of waiving them; therefore, the Court finds his waiver was knowing and intelligent.

**Voluntariness – *Miranda* and Defendant's Statement**

The test for determining the voluntariness of a suspect's confession is whether, considering all the circumstances, the government obtained the statement by physical or psychological coercion or by inducement so that the suspect's will was overcome. *See*

*United States v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)). The standard for determining the voluntariness of a statement is the same as the standard for the voluntariness of a *Miranda* waiver. *See Colorado v. Connelly*, 479 U.S. 157, 169 (1986). Here, Defendant argues that the same behavior by the agents made his waiver and his statement involuntary. Therefore, the Court conducts one analysis as to the voluntariness of both.

Among the circumstances to be considered as to voluntariness are: (1) whether there was police coercion; (2) the length of the interrogation, its location and its continuity; (3) whether police advised the suspect of his rights; and (4) whether there were any direct or implied promises of a benefit. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). Coercive action by the police is a prerequisite to finding that a statement is involuntary. *See Connelly*, 479 U.S. at 167. "The true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes*, 373 U.S. at 513-14.

Defendant relies primarily on his below average intellectual abilities to suggest his will was overborne by the agent's behavior. Defendant acknowledges that low intelligence does not render a statement per se involuntary. *See United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014). However, it is a relevant consideration when evaluating whether a particular person's will was overcome by the police. *Id.* ("what would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.") (quoting *Stein v. New York*, 346 U.S. 156, 185 (1952)). Dr. Martinez testified that Defendant scored extremely low in verbal comprehension, working memory, and full scale IQ. (RT2 at 13-14.) However, he did not provide any testimony about how Defendant's intellectual capacity would impact his behavior during an interrogation generally, nor did he evaluate the actual interrogation of Defendant in this case. (*Id.* at 3-28.)

The Court has read the transcript and reviewed the video recording of the interrogation. (Exs. 1, 2.) The full proceeding lasted less than thirty minutes. Throughout the entire interview, the plain-clothes agents sat on the opposite side of a table from Defendant, who was shackled but not handcuffed. The agents did not promise him anything or induce him with a benefit of any kind.

Defendant points to the agents' tone, contending that they were aggressive, yelled, interrupted, and accused him of lying. Defendant relied upon certain portions of the interview to support his argument and the Court closely reviewed those segments of the video. There are several points in the interview when there is interrupting; however, Defendant interrupts at least as much if not more than the agents. There is no point during the interview when the agents yell. TFO Rodriguez did briefly raise his voice and speak in an aggressive manner prior to the *Miranda* waiver. This occurred over less than two pages of a twenty-eight page transcript. (Ex. 1 at 183-85; Ex. 2.) TFO Rodriguez used a harsh tone in response to Defendant's interruptions, which were impeding the agent from getting an answer from Defendant regarding whether he wanted to waive his *Miranda* rights. (Ex. 1 at 182-83; Ex. 2.) During the exchange, TFO Rodriguez did not pressure Defendant to make a statement; rather he calmly told Defendant that he did not care if he chose to speak to him or not. (Ex. 1 at 183; Ex. 2.) The Court noted one other time during the interview when TFO Rodriguez spoke in a louder voice but it was not aggressive. (Ex. 1 at 196; Ex. 2.)

The interrogation here is in stark contrast to the *Preston* case cited by Defendant. In that case, the agents used numerous coercive interrogation techniques against a suspect with an evident intellectual impairment; the transcript revealed the suspect's will was overborne by the coercive approach. 751 F.3d at 1027-28. Although the agents here notified Defendant that they had evidence of his guilt, Defendant responded repeatedly with "supposedly," and never acquiesced to these suggestions. (Ex. 1 at 195-97.) Further, the agents certainly questioned the veracity of Defendant's statement, in particular the time line of his movements on December 4. However, it was not done aggressively and

there is no indication that Defendant's will was overborne. Defendant may have been confused at points and his statement was not fully consistent. However, he repeatedly denied his involvement in the events and was able to state when he disagreed with the agent's summary of his statements. (Ex. 1 at 194-97, 203-04.) Other than informing Defendant that they had proof of his guilt (some of which may not have been verified at that time), there were no misleading tactics used against him.

At no point during the interrogation did Defendant appear as if he did not understand the questioning. Specific to the *Miranda* waiver, Defendant acknowledges that he invoked his *Miranda* rights and chose not to make a statement in a 2010 criminal case. At a time when his intellectual ability was the same, he was able to decline to speak. This refutes Defendant's suggestion that he was intellectually unable to say no to the agents. The Court finds, after reviewing the totality of the circumstances, that Defendant's *Miranda* waiver and statement were voluntary.

### B. Motion to Suppress Identification

Defendant argues that the procedure used for Agent Pintado's identification of him was unduly suggestive and her identification of him as the driver of the truck was unreliable. He requests that her out-of-court identification be suppressed and that she be precluded from identifying him in court.

The Due Process Clause is implicated if agents used an identification procedure that was unnecessarily suggestive. *See Neil v. Biggers*, 409 U.S. 188, 201 (1972); *Perry v. Hampshire*, 565 U.S. 228, 238-39 (2012). If so, the Court must evaluate whether the improper procedure created a "substantial likelihood of misidentification." *Biggers*, 409 U.S. at 201. In deciding if the identification is nevertheless reliable, the Court evaluates the totality of circumstances, including:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200.

Because TFO Rodriguez used a single photo of an identified suspect for the identification, the procedure was suggestive. The Court does not determine if it was "unduly" suggestive because it concludes that it is reliable, regardless of the suggestiveness of the procedure.

At the time Agent Pintado observed the driver of the blue truck, she was working in a position that required her to observe and evaluate the driver of the truck. The video indicates she was doing just that for the approximately 25 seconds the driver was at her checkpoint station. For most of that time, Agent Pintado was on the step of the truck a few feet from the driver. Thus, Agent Pintado's degree of attention was high and she had a good opportunity to observe the driver. Agent Pintado's prior description of the driver – Hispanic descent, bald, medium build, and 30 to 40 years old – was consistent with Defendant but was not detailed. Agent Pintado identified the photograph approximately 17 hours after observing the driver. She completed her duties at primary inspection thirty minutes after the blue truck passed through her lane (RT1 at 18) and was not working the following day (*id.* at 27); therefore, she had not observed a large number of drivers and vehicles in the intervening hours. She testified that the truck was particularly memorable not only because it fled but also because the driver knocked her off the step by opening the door. She responded with a positive identification almost immediately upon receiving the photograph and was certain in her identification. Evaluating all of these factors, the Court determines that Agent Pintado's identification is reliable.

### III. RECOMMENDATION

It is recommended that, after its independent review of the record, the District Court deny Defendant's Motion to Suppress Statements (Doc. 40) and deny Defendant's Motion to Suppress Identification (Doc. 39).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections to this Report and Recommendation. In light of the May 22 trial date, objections shall be filed on or before **May 3, 2018**. A party may respond to the other party's objections on or before **May 10, 2018**. No reply brief shall be filed on objections

unless leave is granted by the district court. If objections are not timely filed, they may be deemed waived.

Dated this 26th day of April, 2018.

_____
Honorable Lynette C. Kimmins
United States Magistrate Judge